Andrew S. Kingsdale (SBN 255669)
LAW OFFICE OF ANDREW S. KINGSDALE
633 Battery Street, Suite 110
San Francisco, CA 94111
Phone: (415) 548-1950
Fax: (415) 795-4397
Email: andrew@kingsdalelaw.com

*Attorney for Plaintiff Helping Hand Tools*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HELPING HAND TOOLS,<br><br>  Plaintiff,<br><br>  vs.<br><br>NRG ENERGY CORPORATION and<br>CARLSBAD ENERGY CENTER LLC,<br><br>  Defendants. | Case No. **'15CV2382 DMS NLS**<br><br>**Demand for Jury Trial** |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action brought against the owner and operator of a major source of air pollution (a power plant called the Amended Carlsbad Energy Center Project) being constructed without applying for, or obtaining, a necessary federal prevention-of-significant-deterioration ("PSD") permit, in violation of part C of title I of the Clean Air Act ("CAA"), 42 USCS §§ 7470 *et seq.*

**IDENTITIES OF PARTIES**

2. Plaintiff HELPING HAND TOOLS ("2HT") is a non-profit corporation based in Hayward, California. 2HT focuses on preventing community deterioration and protecting the environment through active participation in regulatory proceedings, particularly with respect to air quality preservation. 2HT has members who would suffer concrete, irreparable harms caused by Defendants' failure to apply for a prevention-of-significant-deterioration permit, and their harms would be redressed by the relief sought here. 2HT is a "person" within the meaning of Section 302(e) of the Clean Air Act, 42 U.S.C. § 7602(e).

3. Defendant NRG ENERGY INCORPORATED ("NRG") is a business incorporated in Delaware and headquartered in Princeton, New Jersey and Houston, Texas. NRG is a "person" within the meaning of Section 302(e) of the Clean Air Act, 42 U.S.C. § 7602(e). NRG wholly owns the Cabrillo Power I LLC, which owns and operates the Encina Power Station ("Encina") located in Carlsbad, California. NRG also wholly owns Defendant CARLSBAD ENERGY CENTER LLC.

4. Defendant CARLSBAD ENERGY CENTER LLC ("CEC LLC") is a business incorporated in Delaware and headquartered in Carlsbad, California. CEC LLC is a wholly-owned subsidiary of NRG. CEC LLC is a "person" within the meaning of Section 302(e) of the Clean Air Act, 42 U.S.C. § 7602(e). CEC LLC intends to construct and, upon information and belief, is constructing the Amended Carlsbad Energy Center Project ("ACECP").

5. Defendants at all times herein mentioned were the agents of each other and in doing the things hereinafter alleged were acting within the course and scope of such agency and the permission and consent of their co-defendants.

## JURISDICTION AND VENUE

6. This court has subject matter jurisdiction because this action arises under a federal statute, section 304(a)(3) of the Clean Air Act, 46 U.S.C. §7604(a)(3). Plaintiff brings this suit on its own behalf and on behalf of its members against "persons" (Defendants) proposing to construct, and that (upon information and belief) have commenced constructing, a major emitting facility without a prevention of significant deterioration permit required under the Clean Air Act, 42 U.S.C. § 7475, and EPA regulations, 40 C.F.R. § 52.21.

7. This court has personal jurisdiction over the Defendants because they have commenced, or intend to imminently commence, construction of a power plant within this District.

8. Under 42 U.S.C. §7604(c), venue is proper in the Southern District of California. This action concerns air pollution emissions from an emissions source located in this judicial district. Venue also is proper in this District under 28 U.S.C. §§ 139l(b) because CEC LLC is headquartered in this District and because a substantial part of the events or omissions giving rise to the claim occurred or will occur in this District.

## STATEMENT OF FACTS

### Statutory and Regulatory Background

9. The Clean Air Act is designed to protect and enhance the quality of the nation's air, thereby promoting the public health and welfare and the productive capacity of its population. Section 101(b)(l) of the Clean Air Act, 42 U.S.C. § 740l(b)(l).

10. Part C of Title I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration ("PSD") of air quality in those areas designated as either in attainment or unclassifiable for purposes of meeting National Ambient Air Quality Standards. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process. These provisions are referred to herein as the Clean Air Act's "PSD program."

11. The core of the PSD program is that "[n]o major emitting facility ... may be constructed [or modified] in any area" until a responsible authority issues it a PSD permit. 42 U.S.C. § 7475. *See also* 40 C.F.R. § 52.21(a)(2) and (r).

12. Under the United States Environmental Protection Agency's ("EPA") regulations implementing the PSD program, PSD permitting requirements apply to major stationary sources and major modifications. "No stationary source or modification to which the requirements of paragraphs (j) through (r)(5) of this section apply shall begin actual construction without a permit which states that the stationary source or modification will meet those requirements." 40 C.F.R. § 52.21(a)(2)(iii). The requirements of paragraphs (j) through (r)(5) "apply to any major stationary source and any major modification with respect to each pollutant subject to regulation under the Act that it would emit." 40 C.F.R. § 52.2l(a)(2).

13. A "major stationary source" is a stationary source of air pollutants that emits, or has the potential to emit, 100 tons per year or more of any regulated New Source Review pollutant ("criteria pollutants"). One type of "major stationary source" is fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input. 40 C.F.R. § 52.21(b)(1)(i).

14. "Major modification" is defined as "any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase (as defined in paragraph (b)(40) of this section) of any regulated NSR pollutant (as defined in paragraph (b)(50) of this section); and a significant net emissions increase of that pollutant from the major stationary source." 40 C.F.R. § 52.21(b)(2)(i).

15. "Significant emissions increase" means an increase in emissions of at least the following amounts of any of the following regulated NSR pollutants:

    a.    100 ton tons per year ("tpy") or more of carbon monoxide ("CO");

    b.    40 tpy of oxides of nitrogen (or "NOx");

    c.    40 tpy or more of sulfur dioxide (or "S02");

    d.    25 tpy or more of particulate matter (or "PM");

    e.    15 tpy of particulate matter less than ten microns ("PM10"), and

    f.    10 tpy of direct particulate matter less than 2.5 microns ("PM2.5").

40 C.F.R. § 52.21(b)(23)(i); 40 C.F.R. § 52.21(b)(40).

16. "Net emissions increase" exists when the sum of "[a]ny increase in actual emissions from a particular physical change or change in method of operation" and "[a]ny other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable" exceeds zero.  40 C.F.R. § 52.2l(b)(3)(i).

17. A major modification's emissions "increases and decreases" are based on the existing emissions source's "baseline actual emissions." *Id.*  EPA regulations define "baseline actual emissions" as "the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 5-year period immediately preceding when the owner or operator begins actual construction of the project." 40 C.F.R. § 52.21(b)(48)(i).

18. Although generally a facility's owner/developer may choose the baseline period, a permitting authority (here, EPA) has discretion to require the use of a different baseline period "upon a determination that it is more representative of normal source operation."   40 C.F.R. § 52.21(b)(48)(i); *see also* 40 C.F.R. § 51.166(b)(48)(i).

19. When a facility involves multiple emissions units, "only one consecutive 24-month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24-month period can be used [f]or each regulated NSR pollutant." 40 C.F.R. § 52.21(b)(48)(i)(c)

20. Additionally, "[t]he average rate [of emissions] shall not be based on any consecutive 24-month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (b)(48)(i)(b) of this section." 40 C.F.R. § 51.166(b)(48)(i)(d).

21. Any owner or operator of a new major stationary or major modification subject to 40 C.F.R. § 52.21 who constructs or operates a source not in accordance with a PSD permit application or commences construction without applying for and receiving approval thereunder is subject to an enforcement action. 42 U.S.C. § 7413(b); 40 C.F.R. § 52.2l(r)(l).

22. EPA has sole jurisdiction to issue PSD permits for emission sources located within the San Diego Air Pollution Control District ("Air District"), such as the ACECP. EPA has not delegated authority to any governmental entities that have approved construction of the ACECP, including the California Energy Commission or the Air District. EPA has not delegated authority to the Air District to implement the federal PSD program, nor has it approved a state implementation plan (SIP) rule for the Air District to implement the federal PSD program.

### The Existing Encina Power Station and
### The Proposed Amended Carlsbad Energy Center Project

23. Encina Power Station ("Encina") is owned by Cabrillo Power I LLC, a wholly-owned subsidiary of NRG, and located at 4600 Carlsbad Boulevard in Carlsbad, California. It consists of consists of five natural-gas-fired boilers with a total capacity of approximately 1000 megawatts (MW), plus a 15 MW peaking turbine. Encina is an existing major source of emissions as defined under 40 CFR 52.21(b)(1).

24. The Amended Carlsbad Energy Center Project ("ACECP") also will be located at 4600 Carlsbad Boulevard in Carlsbad, California and will consist of six General Electric LMS simple-cycle combustion turbine generators capable of producing approximately 632 MW.

25. Upon information and belief, Defendants have "commenced" construction of the ACECP, as that term is defined in 40 CFR 52.21(f)(v)(b)(9), or intend to imminently commence constructing ACECP. Therefore, if the ACECP qualifies as a major modification, then Defendants are required to obtain a federal PSD permit.

///
///
///
///
///
///
///

26. As a condition for certifying ACECP, both the California Energy Commission and the San Diego Air Pollution Control District have limited the proposed power plant's emissions as follows:

| Pollutant | Maximum Emission level certified by California Energy Commission (tons per year) |
|---|---|
| $NO_X$ | 84.18 |
| CO | 77.8 tons per year + N x 4.05 tons/yr<br><br>Where N=number of turbines with commissioning periods occurring within the 12-calendar-month period. |
| VOC | 24.1 |
| PM10 | 28.4 |
| $SO_X$ (calculated as $SO_2$) | 5.6 |

27. Under the federal PSD program, emissions limits based on permits to operate represent a facility's "potential to emit" only if the limits are "federally enforceable."

28. On April 17, 2015, the San Diego Air Pollution Control District issued a Revised Final Determination of Compliance (FDOC) constituting an authority to construct permit.   In the FDOC, the Air District analyzed the applicability of the Air District's District PSD requirements.  Applying those District requirements, the Air District determined that ACECP would be a major modification.  The Air District used a 5-year average (2009-2013) Encina's emissions to determine the baseline for District PSD applicability.  Using this baseline, the Air District calculated that ACECP's net emissions increase of NOx, when factoring in retirement of Encina, would be 39.95 tons per year.  Like the federal PSD requirement, an increase of forty tons per year of NOx would trigger District PSD requirements.  Thus the emissions from the new source would fall 0.125% under the 40 tons per year threshold or conversely reach 99.875% of the threshold.

29. Upon information and belief, Defendants are relying on the Air District's District PSD applicability determination as grounds for declining to apply to EPA for a PSD permit and/or applicability determination.

30. The Air District does not have authority to issue federal PSD permits or make applicability determinations about the federal PSD program.  That authority rests with EPA.  As

stated in the Air District's FDOC, the Air District's PSD analysis was "directed toward determining applicability and requirements for District PSD and not directed toward determining applicability and requirements of federal PSD."

31. EPA has not issued a PSD applicability determination for the ACECP.

32. On October 13, 2010, EPA issued a PSD applicability determination finding for a prior, cleaner iteration of the proposed facility (called the Carlsbad Energy Center Project). Among other conclusions, the October 13, 2010 PSD applicability determination found that the net increase of NOx emissions would be 39.2 tons per year. On January 10, 2011, EPA sent a letter to Defendant NRG revising this analysis and finding, among other things, that the net increase of NOx emissions would be 31.2 tons per year.

33. In a July 18, 2011 letter to Defendant NRG, EPA withdrew the January 11, 2011 letter as moot. EPA also informed NRG "that we have concluded that the analysis contained in [the January 11, 2011 letter] was made in error. As such, neither the overall determination nor the rationale and analysis contained therein can be relied upon to undertake actions related to the CECP or any other facility. In revoking this particular analysis, EPA emphasizes that there still may be specific permitting circumstances in which EPA may use the discretion provided by 40 CFR §52.21 (b)(48)(i) to select a different period for determining the baseline actual emissions, but the use of such discretion will be based on the particular facts of the permitting situation under consideration."

34. In the July 18, 2011 letter to Defendant NRG, EPA added that " the discretion to consider a different period for calculating baseline actual emissions for determining PSD applicability is limited to applicability determinations performed by the Agency and other approved permitting authorities and may not be invoked independently by emission sources and/or permit applicants."

35. EPA also issued a "Notice" about the January 10, 2011 and July 18, 2011 letter, which stated: "The following two letters pertain to a Prevention of Significant Deterioration (PSD) applicability determination made by EPA Region IX for the Carlsbad Energy Center Project (CECP) proposed by NRG Energy Inc. – West Region. While both the letters are being provided for context, as clearly stated in the July 18, 2011 letter, *the January 11, 2011 PSD applicability determination is no longer valid and neither the overall determination nor the rationale and analysis contained in it*

*can be relied upon to undertake actions related to the CECP or any other facility.* Accordingly, an appropriate watermark has been added to the attached copy of the letter that was issued on January 11, 2011." (Emphasis in original.)

36. An actual controversy has arisen and now exists between the parties relating to whether Defendants must apply for a federal PSD permit. Plaintiff has participated in the public hearing processes for the ACECP certification and permits before the California Energy Commission and the San Diego Air Pollution Control District. Plaintiff consistently has argued that Defendants must apply for a federal PSD permit.

**ACECP Is a New Major Stationary Source If Defendants Retire the Encina Power Station to Comply with the Clean Water Act and California's Once-Through-Cooling Policy**

37. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

38. The State Water Resources Control Board (State Water Board) adopted the Statewide Policy on the Use of Coastal and Estuarine Waters for Power Plant Cooling (OTC Policy) requiring power plants to reduce the harmful effects associated with the cooling water intakes on life in the ocean and estuaries.

39. The State Water Board adopted this OTC Policy to comply with federal Clean Water Act Section 316(b), which states that the location, design, construction and capacity of cooling water intake structures must reflect the best technology available to protect aquatic life.

40. Encina Power Station must comply with the OTC Policy by December 31, 2017.

41. Upon information and belief, due to Encina's inherent design it cannot be modified to use a different technology that would avoid these harmful effects. Rather, to comply with OTC Policy requirements the Encina plant must be decommissioned and deconstructed entirely.

42. If Encina must be decommissioned and deconstructed to comply with OTC Policy, then the loss of its emissions are not creditable toward reducing ACECP emissions when determining ACECP's potential to emit criteria pollutants. Instead, ACECP must be deemed an entirely new emissions source.

43. ACECP will be a major emissions source subject to PSD permitting requirements if Encina is forced to decommission because of state regulatory requirements.

**ACECP Is a Modified Major Stationary Source If the Encina Power Station Continues to Operate After ACECP Begins Operating**

44. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

45. If one or more of Encina's emission units continues to operate when ACECP also becomes operational, then ACECP will be a major modification with net emissions that require Defendants to apply for a PSD permit.

46. There is a real possibility that one or more of Encina's emission units will continue to operate if and when ACECP becomes operational.  For example, Encina Power Station uses a Once-Through-Cooling design that has been disfavored by California regulators.  On May 4, 2010 the State Water Board adopted a Policy on the Use of Coastal and Estuarine Waters for Power Plant Cooling (Policy) requiring that Encina reduce or terminate Once-Through-Cooling by December 31, 2017. Nevertheless, NRG can continue to operate Encina past December 31, 2017 if the Statewide Advisory Committee on Cooling Water Intake Structures (SACCWIS) recommends to the California State Water Board that Encina may operate beyond that deadline for electrical grid reliability purposes.

47. Additionally, California Energy Commission's Final Decision to certify ACECP does not require Encina to terminate operations once ACECP starts operating.  For example, the California Energy Commission has found that the California Independent System Operator ("CAISO") could mandate the continued operation of Encina's Units 4 and 5 for electric reliability purposes until further generation or transmission upgrades allow for their decommissioning.

48. Similarly, the Air District's proposed Final Determination of Compliance states: "although the District fully expects the boilers and peaking turbine of the EPS to be shut down and demolished, the permit conditions do not require this."

49. Based on these considerations, EPA could make different assumptions about ACECP's potential to emit pollutants than the Air District's assumptions.

**ACECP Is a Major Modification Because 2012 Emissions Were Anomalous**

50. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

51. If ACECP is deemed a "modification" of Encina, rather than an entirely new major source, then upon information and belief ACECP will be a "major modification" for one or more regulated criteria pollutants, thereby requiring Defendants to apply for a PSD permit.

52. ACECP will cause a "significant emissions increase," as defined in 40 CFR 52.21(b)(40), of one of more regulated criteria pollutants. For example, under the California Energy Commission's certification, ACECP has the potential to emit 84.14 tons per year of nitrogen oxides ("NOx"), and over 40 tons per year of NOx is significant. *See* 40 CFR 52.21(b)(40).

53. Upon information and belief, ACECP also will result in a "significant net emissions increase" of one of more regulated NSR pollutants when taking into account possible emission reductions from decommissioning the Encina Power Station.

54. Encina emissions data from 2012 should not be used to determine baseline emissions because 2012 was anomalous, and not representative of normal source operation. In 2012, Encina Power Station had an abnormal spike in emissions (in tons per year). Starting in January 2012, the San Onofre Nuclear Generating Station ("SONGS"), a 2200 MW base-load nuclear facility, ceased operating. This unanticipated shut-down of a significant base-load power plant required other power plants, including the Encina Power Plant, to operate at above-average levels to maintain overall system reliability. Then, in 2013, this electricity supply crunch was reduced by various factors including the installation of synchronous condensers at Huntington Beach Generating Station and the start of operations at Sunrise Power Link.

55. Furthermore, there is inadequate information for accurately determining baseline actual emissions, in tons per year, of criteria pollutants from Encina. In particular, 2012 emissions data either varies widely or simply does not exist. For example, the following entities and agencies have large discrepancies in reported emissions of criteria pollutants NOx, CO, and PM10/PM2.5: (1) Defendants, in their application to the Air District for an authority to construct dated May 8, 2014, (2) the Air Pollution District, in its Final Determination of Compliance/Authority to Construct dated

April 17, 2015, (3) the California Air Resources Board, in its Facility Search Engine.  Other 2012 data simply does not exist, including data from (4) the Air Pollution District's annual emissions inventory reports for source emission located within the District, and (5) EPA Title V reports.

**Encina Reported Annual emissions (tons per year), for 2012**

|  | PM10/PM2.5 | CO | NOx |
|---|---|---|---|
| Defendant's Application for Authority To Construct | 63.3 | 77.86 | 84.65 |
| Air District' FDOC/ATC[1] | 62.29 | 77.76 | 86.71 |
| CARB's Facility Search Engine | 24.1 | 104.9 | 15.9 |
| Air District's Emissions Inventory Reports | N/A | N/A | N/A |
| EPA's Title V Reports | N/A | N/A | N/A |

56. The discrepancy in NOx emissions data is particularly important because the Air District relied on the 84.65 tpy level to find that net increase in NOx emissions would be 39.95 tons per year. "Significant" increase would be 40 tons per year.   Thus, according to the Air District, NOx emissions from ACECP would fall just 0.125% under the threshold for requiring a PSD permit, or conversely would reach 99.875% of the threshold.   But if the Air District uses Defendant's reported NOx amounts for 2013 (84.65 tons per year), then the 40 tons per year "significance" threshold would be surpassed.

57. Because of the inconsistencies in this emissions data, emission data including the year 2012 is inadequate.  Therefore, a different 24-month period average (for example, using 2010 and 2011 emissions levels) would be a more appropriate measure of baseline emission from the Encina Power Plant.

58. Based on emission limits imposed by the California Energy Commission, and appropriate baseline two-year average of Encina Power Plant emissions, ACECP's net emissions of NOx would exceed 40 tons per year.  The Air District's District PSD analysis is not binding on EPA, which has emphasized to Defendants that EPA might select a different baseline period.

59. Furthermore, the California Energy Commission's emissions limits are not federally enforceable, and therefore the net emissions are likely to be even higher.

---

[1] Available at http://www.sdapcd.org/toxics/fac_emissions/facilities.html.

60. Upon information and belief, ACECP may have a potential to emit criteria pollutants surpassing the California Energy Commission's estimated emissions. For example, the California Energy Commission estimated emissions based on the assumption that each combustion turbine generator of the ACECP would operate no more than 2,700 hours per year (or approximately 31% of the year). But ACECP's potential to emit would not be limited by this assumption under EPA's federal PSD applicability determination.

### Defendants Have Not Applied to EPA for A PSD Permit

61. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

62. Upon information and belief, Defendants have never applied to EPA for a federal PSD permit for the ACECP, and EPA has not made a currently-effective PSD applicability determination.

63. Since the EPA's July 18, 2011 letter to Defendant NRG rescinding its prior PSD applicability analysis, upon information and belief EPA has not made any PSD determinations nor taken any action under the PSD program for the ACECP, nor have Defendants applied for this PSD permit.

64. Upon information and belief, the Air District, at EPA's request, notified Defendants that if the ACECP triggered federal PSD requirements under the federal PSD program, then Defendants would be required to apply for and obtain a federal PSD permit from EPA.

65. Defendants rely on the Air District's District PSD determination as grounds for declining to apply for a federal PSD permit. Aside from selectively using unreliable emissions data, the Air District also determined net emissions by averaging five years instead of using a consecutive 24-month period, as required under EPA's federal PSD regulations.

### FIRST CAUSE OF ACTION

### VIOLATION OF CLEAN AIR ACT

66. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

67. Defendants intend to imminently commence construction of ACECP without applying for a federal PSD permit. Furthermore, upon information and belief, Defendants have commenced construction of the ACECP.

68. Defendants' construction of ACECP without a federal PSD violates Section 165(a) of the Clean Air Act, 42 U.S.C. § 7475(a) as well as the PSD regulations set forth in 40 C.F.R. §§ 52.21(a) and (r) by, *inter alia*: 1) constructing a major source of emissions without first obtaining a PSD permit, 2) undertaking major modification without first obtaining a PSD permit, and/or 3) by failing to meet BACT emission limitations as required by 40 C.F.R. § 52.210.

69. Unless restrained by an order of this Court, the violations of the Clean Air Act alleged in this First Claim for Relief will continue or imminently occur.

70. As provided in 42 U.S.C. § 7413, the violations set forth above subject Defendant to injunctive relief and civil penalties. *See also* 40 C.F.R. § 19.4.

71. A declaratory judgment is necessary because Plaintiff contends and Defendants deny that Defendants have an obligation to apply for or obtain a federal PSD permit and/or PSD applicability determination from EPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiff and provide the following relief:

a. Permanently enjoin Defendants from constructing the ACECP without first applying for a prevention of significant deterioration permit from the United States Environmental Protections Agency;

b. Compel Defendants to apply for a PSD permit from EPA;

///
///
///
///
///
///

   c.  Declare Defendants' duties to apply for a PSD applicability determination by EPA, under the Declaratory Judgment Act, 28 U.S.C. § 2201;

   d.  Impose appropriate civil penalties on Defendants;

   e.  To award costs of litigation, including reasonable attorney and expert witness fees, to Plaintiff; and

   f.  Grant such other relief as the Court deems proper.

Date: _____      s/Andrew Kingsdale
                              Andrew S. Kingsdale
                              LAW OFFICE OF ANDREW S. KINGSDALE
                              633 Battery Street, Suite 110
                              San Francisco, CA 94111
                              Phone:  (415) 548-1950
                              Fax:  (415) 795-4397
                              Email:  andrew@kingsdalelaw.com

*Attorney for Plaintiff Helping Hand Tools*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Date: _____      s/Andrew Kingsdale
                              Andrew S. Kingsdale
                              LAW OFFICE OF ANDREW S. KINGSDALE
                              633 Battery Street, Suite 110
                              San Francisco, CA 94111
                              Phone:  (415) 548-1950
                              Fax:  (415) 795-4397
                              Email:  andrew@kingsdalelaw.com

*Attorney for Plaintiff Helping Hand Tools*